**KING MOENCH HIRNIAK MEHTA & COLLINS, LLP**
Matthew C. Moench, Esq. (031462007)
51 Gibraltar Drive, Suite 2F
Morris Plains, New Jersey 07950
973-998-6860
973-998-6863 (facsimile)
MCM@kmhmlawfirm.com

**GRAVES GARRETT, LLC**
Edward D. Greim, Esq. (Mo. Bar #54034)*
Paul Brothers, Esq.
1100 Main Street, Suite 2700
Kansas City, MO 64105
Phone: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
*Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JUSTIN CAPORALE, TIM UNES, MAGGIE MULVANEY, and MEGAN POWERS,** | |
| Plaintiffs, | Civil Action No._____ |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS** | |
| Defendant. | |

PLAINTIFFS Justin Caporale, Tim Unes, Maggie Mulvaney, and Megan Powers, by and

through their counsel, Graves Garrett LLC and King Moench Hirniak Mehta & Collins, LLP, for

their Complaint against Defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon"), state

and allege as follows:

1.      This is an action to protect the Plaintiffs from a Congressional subpoena (the "Subpoena") that lacks a lawful purpose and seeks to invade the Plaintiffs' constitutional rights to privacy and to confidential political communications. The Plaintiffs are four private citizens who were not involved in any federal government activities or programs. They have only one apparent connection to the matter Congress claims to be investigating: they served as vendors to help staff a peaceful, lawful, orderly and patriotic assembly to promote First Amendment-protected speech. Despite this, the Plaintiffs voluntarily sat for lengthy interviews and gave thousands of documents to Congressional investigators. The Plaintiffs answered every single question about what happened at the event, who spoke, who the Plaintiffs spoke with, and when. If Congress wanted to know anything more about the Plaintiffs' brief involvement with the events it is allegedly investigating, it needed only have asked. Instead, Congress rewarded Plaintiffs for their cooperation by pivoting to Defendant Verizon Wireless, their telecommunications carrier, to indiscriminately demand detailed information about their accounts, contacts, personal and political associates, and physical locations. The Subpoenas covered a three-month period that greatly exceeds the 10-day window of time about which Congress questioned the Plaintiffs.

2.      This Subpoena was not issued by a validly constituted committee; is not pertinent to the matter Congress is purporting to investigate; does not pursue a legislative purpose; violates the Plaintiffs' First and Fourth Amendment rights; and violates the Stored Communications Act, 18 U.S.C. § 2701, et seq. The Plaintiffs seek a judgment declaring that the Subpoena is invalid and enjoining Defendant, Verizon Wireless, from producing their data to the Select Committee.

**THE PARTIES**

3.      Plaintiff Justin Caporale is a resident of Washington, D.C. On December 3, 2021, he received notice from Defendant that it was served with a Subpoena for his cell phone records, attached hereto along with the transmittal letter as Exhibit A.

4.      Plaintiff Tim Unes is a resident of Virginia. On December 3, 2021, he received notice from Defendant that it was served with a Subpoena for his cell phone records, attached hereto along with the transmittal letter as Exhibit B.

5.      Plaintiff Maggie Mulvaney is a resident of Washington, D.C. On December 3, 2021, she received notice from Defendant that it was served with a Subpoena for her cell phone records, attached hereto along with the transmittal letter as Exhibit C.

6.      Plaintiff Megan Powers is a resident of Ft. Lauderdale, Florida. On December 3, 2021, she received notice from Defendant that it was served with a Subpoena for her cell phone records, attached hereto along with the transmittal letter as Exhibit D.

7.      Defendant Cellco Partnership d/b/a Verizon Wireless has a principal place of business in New Jersey. Verizon's "Security Subpoena Compliance" has its principal office at 180 Washington Valley Road, Bedminster, Somerset County, New Jersey. It is from this address that Verizon addressed its letter to each Plaintiff advising them of the Subpoena.

## JURISDICTION AND VENUE

8.       This case challenges the validity of a Subpoena issued by a body calling itself the Select Committee to Investigate the January 6 Attack on the United States Capitol (the "Select Committee"). It raises claims regarding the scope of the investigative power of Congress under Article I of the United States Constitution, claims arising under the First and Fourteenth Amendments of the United States Constitution, and claims arising under the Stored Communications Act, 18 U.S.C. § 2701, et seq.

9.      The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343.

10.      The Court has personal jurisdiction over Defendant Verizon because its principal place of business is in New Jersey, and its acts in responding to the Subpoena, communicating

with Plaintiffs about the Subpoena, and, potentially, in producing data responsive to the Subpoena, were or will be undertaken in and from New Jersey.

11. For the same reasons this Court has personal jurisdiction, venue in this Court is proper under 28 U.S.C. § 1391(b).

## BACKGROUND ALLEGATIONS

12. On January 6, 2021, a group of protesters breached the Capitol grounds, entered the Capitol, and, by causing disorder, successfully delayed the certification of the votes of the electors for the 2020 presidential election by several hours.

13. On June 30, 2021, the House of Representatives passed H. Res. 503 (the "Resolution"), establishing "the Select Committee to Investigate the January 6th Attack on the United States Capitol." The Resolution was passed just two days after its introduction, with two Members caucusing with Republicans voting "yea."

14. Under Section 2(a) of the Resolution, "the Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." The Resolution also required that "[t]he Speaker shall designate one Member to serve as chair of the Select Committee." H. Res. 503 § 2(b), 117th Cong. (2021).

15. The Speaker appointed only 9 Members to the Select Committee. The Speaker did not appoint any Members after consultation with the House Minority Leader, Representative Kevin McCarthy. Rather, the Speaker appointed the only two Members who currently caucus with the Republican Party and who had voted for the Resolution. The Speaker failed to appoint any Member suggested by the House Minority Leader.

16. The Speaker did not appoint a Ranking Member. The Select Committee does not have a Ranking Member.

17.     The Resolution identifies a total of three "purposes" of the Select Committee. They are: (1) to "investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021 domestic terrorist attack on the United States Capitol Complex… and relating to the interference with the peaceful transfer of power, including the facts and causes relating to the preparedness and response of [law enforcement and other instrumentalities of government], as well as the influencing factors that fomented such an attack…"; (2) to "examine and evaluate evidence developed by relevant Federal, state, and local government agencies regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol and targeted violence and domestic terrorism relevant to such terrorist attack"; and (3) to "build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other [investigations] into the domestic terrorist attack on the Capitol, including investigations into influencing factors related to such attack."

18.     The Resolution identifies a total of three "functions" of the Select Committee. They are: (1) to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) to "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol regarding" various federal governmental operations; and (3) to "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures described in subsection (c) as it may deem necessary."

19.     Subsection (c) of Section 4 describes three categories of "corrective measures": "changes in law, policy, procedures, rules, or regulations that could be taken" (1) "to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions"; (2) "to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans"; and

(3) "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism."

20.     The Select Committee has established a website that reports on its proceedings and publishes statements by the Select Committee's Speaker-designated Members—that is, the Select Committee's only Members. See https://january6th.house.gov/

21.     The Select Committee held its first and only hearing on July 27, 2021.

22.     Approximately one month later, the Select Committee's Chairman wrote to over thirty telecommunications and social media companies to demand that they preserve all metadata and content of their customers' communications, and that they not disclose the Chairman's demand to their customers. Upon information and belief, the Plaintiffs' accounts were included in this demand, because it referenced organizers of rallies on January 6, 2021.

23.     Upon information and belief, at least some of the recipients of the letter, including Verizon, were required to copy account and content data in order to protect it from automated deletion and comply with the Select Committee's preservation demand.

24.     In late September, 2021, the Select Committee publicized with fanfare its issuance of subpoenas to the Plaintiffs for the production of documents and depositions. See Exhibits E-H.

25.     Letters signed by the Select Committee Chairman, which accompanied the subpoenas (the "Letters"), claimed that the Plaintiffs' testimony and documents were relevant because they had acted as vendors for the Ellipse Rally (the "Rally") held earlier on January 6, 2021, in front of the White House. This first round of subpoenas made sweeping demands for documents to be produced in less than two weeks after service. They also demanded depositions within less than 30 days.

26.     In an apparent effort to tie the Ellipse Rally to the Capitol breach, the Letters reported comments made by President Donald Trump and other speakers at the Rally or in the weeks before the Rally. At no point, however, did the Letters suggest that the President, any speakers at the Rally, any participants or attendees at the Rally, or the Plaintiffs themselves engaged in any conduct at the Rally other than peaceful, First Amendment-protected speech and assembly. At no point did the Letters suggest that the Select Committee lacked any information about who actually spoke at the Rally, what was said there, or what happened there.

27.     Despite the weak case the Letters made for this round of subpoenas, the Plaintiffs recognized that the Select Committee's members had made numerous public threats that anything other than complete and immediate cooperation would result in a finding by Congress of criminal contempt. Further, statements by officers in the Executive Branch—which would be tasked with making a final decision as to whether to charge any witness who failed to precisely meet the subpoenas' terms—raised questions about whether the Department of Justice would be exercising independent prosecutorial discretion.

28.     Confronted with these threats, and faced with the wave of publicity the Select Committee had generated regarding their subpoenas, each Plaintiff cooperated by voluntarily producing documents and testimony. They did, however, assert pertinence, legislative purpose, and First and Fourth Amendment objections to questions about their political beliefs and political discussions with colleagues, questions asking them to speculate about what other people had intended in their remarks about individuals who had been considered and then rejected as Rally speakers, pre-Rally discussions with Rally organizers about the content and speakers for the Rally, and lists of attendees and "VIPs" who attended the Rally. Plaintiffs withdrew almost all of these

objections when it became clear that other Rally witnesses no longer desired to assert constitutional protections over this information, and had already produced it.

29.     Regardless, the Plaintiffs did not at any time object to any questions about who actually did speak at the Rally, what they saw, heard, and otherwise witnessed at the Rally and in its aftermath, and whether certain individuals were at the Rally. The Plaintiffs fully disclosed who paid them, and who they paid, to work at the Rally, although they redacted account numbers and personal and confidential contact information without objection by the Select Committee.

30.     Finally, the Plaintiffs answered every question about who they had spoken with and when those conversations occurred—the same matters that are ostensibly being double or triple-checked by the current Subpoenas.

31.     The Plaintiffs' voluminous documents and interview responses showed that the Rally was nothing other than a peaceful, lawful, First Amendment-protected assembly for the purposes of engaging in political speech.

32.     The Select Committee focused much of its questioning on the possibility of a "march" to the Capitol. Although some speakers at the Rally had planned to mention a "march" to the Capitol (and President Trump did ask attendees to go to the Capitol, albeit in a peaceful manner), no planning or organizing was actually done by those who would have been tasked with doing this—the event organizers and vendors—to stimulate a march or make one logistically possible.

33.     The term "march" is often used to brand political events in Washington, D.C. But true marches are rare. Without careful and detailed planning, it is difficult, if not impossible, to cause any significant number of people to move together from one location to another. A true

march requires substantial organization and set-up. It also requires continuing guidance to keep people moving together.

34.     The Ellipse Rally perimeter was not set up with entrances and exits to allow a mass movement of people in the direction of the Capitol. Organizers were not identified, and way stations were not set up along a set route, to encourage and aid a mass movement of people. Nothing was done at the conclusion of the Rally to actually organize, gather, and summon people to move together or to follow along a set route to the Capitol.

35.     For all of these reasons, among others, those who were on hand observed that as the Rally attendees filtered out of the Ellipse perimeter, over a mile from the Capitol, no mass surge or march did in fact start from the Rally and lead into a Capitol attack. The documents and testimony did not show that Trump supporters arrived at the Rally and surged out, emotionally charged and incited, primed to attack the Capitol. Instead, the documents and testimony showed that the Rally began and ended in a peaceful manner, no different from any other Trump campaign event.

36.     The Select Committee also expressed interest in exploring whether Rally organizers' communications with National Park Service and other officials provided adequate notice that many people would be in Washington, D.C. on January 6th, and that it was likely that many would congregate on the National Mall and, eventually, around the Capitol grounds, where at least one other rally had received a permit. Yet the Select Committee—which for six months has had full access to law enforcement and National Park Service documents—already knows that the Rally organizers fully and effectively communicated with law enforcement. For example, the morning of January 6, a Department of Homeland Security ("DHS") email shows that a Regional Director of the Federal Protective Service remarked that "we are tracking three major rallies,"

including the Ellipse Rally, where President Trump was scheduled to speak, and where approximately 20,000 people would attend. DHS "expected that a portion of this group will march to the U.S. Capitol prior to 1300 hours." In fact, the Ellipse Rally was unable to accommodate 20,000 within the perimeter due to the slow pace of magnetometer (metal detector) screening, and as it turned out, there was not a "march" of any significant number of people from the Rally.

37.     Additionally, the Select Committee has long had access to the results of a separate investigation of the events of January 6 that has been conducted by the Federal Bureau of Investigation. That investigation has focused on the individuals who actually breached the Capitol on January 6. At no time has that investigation suggested that there was any centralized organization or planning for the breach, that the Plaintiffs could conceivably have information about anyone who performed that role, or that the Plaintiffs ever had contact with such a person. The Select Committee already knows that these Plaintiffs could not possibly have had contact with individuals who planned or participated in the Capitol breach.

38.     The Plaintiffs' thousands of documents and over 15 hours of combined interview testimony were an opportunity for the Select Committee to fully explore these questions, but even this exhaustive effort was just a small fraction of the Select Committee's inquiry. Since June 2021, the Select Committee claims to have interviewed 250 witnesses. See https://january6th.house.gov/news/press-releases/thompson-cheney-opening-statements-rules-committee-meeting-0 In short, with respect to the Ellipse Rally, there can be little if anything that is not known to the public or the Select Committee. That is certainly true regarding any information the Plaintiffs may have.

39.     Nonetheless, on or about November 24, 2021, the Select Committee issued a Subpoena to Defendant Verizon, demanding production of a mass of cell phone data for each of

the four Plaintiffs by 10:00 a.m. on December 8. News reports suggest that the four Plaintiffs are among over 100 individuals whose accounts have been subpoenaed. https://www.cnn.com/2021/12/07/politics/january-6-committee-phone-records/index.html

40.     The November 24 Subpoena to Verizon—the only subpoena at issue here—clearly covered a number of individuals. "Part A" of the Subpoena explains its scope. "Part B" of the Subpoena apparently included the phone numbers of many Verizon customers whose account data was being subpoenaed, and for that reason, Verizon did not transmit Part B to the account recipients.

41.     According to Part A, the Select Committee seeks all subscriber information and cell phone data associated with the Plaintiffs' personal cell phone numbers. The subscriber information requested includes subscriber names and contact information, authorized users, time of service provided, account changes, associated IP addresses, and other metadata. The cell phone data requested could include all calls, text messages, and other records of communications associated with that phone number. This data can also be used for historic cell site analysis. See Exs. A-D.

42.     Additionally, despite the fact that these Plaintiffs' involvement with the Ellipse Rally spanned only 10 to 14 days in late December 2020 and early January 2021, the Select Committee sought their personal cell phone data for three months: from November 1, 2020 to January 31, 2021. The Select Committee is well aware that Plaintiffs cannot have had relevant communications this late or this early in time.

43.     Assuming that dozens or perhaps hundreds of other individuals' private data is being sought with the same one-size-fits-all, multi-month request that fails to match the specific relevance (if any) of a given individual to the investigation, the Select Committee is clearly

planning to do far more than "double check" that cooperating witnesses' previous document production or testimony was complete.

44.     Instead, the Select Committee's Subpoena will yield data that will be used to populate a massive database of the personal friends and political associates of not just Plaintiffs, but everyone who has had any connection to the Trump campaign or other political associations or vendors who worked with it. By analyzing data patterns in phone numbers, length of calls, texts, and geolocation data, investigators can build a permanent nationwide model of intimate political associations and networks within the conservative movement that has relevance far beyond "legislating" to deal with Capitol security, election integrity, or the processes for certifying electoral votes. The billions of data points yielded can recreate not just intimate relationships, but also locations and movements, creating a virtual CAT-scan of the Select Committee's political opposition, likely including even their own colleagues in the House of Representatives.

45.     This massive opposition research project dwarfs anything ever attempted or conceived in the history of the Congress. It bears more similarity to a foreign intelligence operation or a domestic criminal investigation than to a good-faith effort to secure the facts needed to draft legislation or oversee an executive agency. The Select Committee has lost its bearings.

## Count I
### (Subpoena Is Invalid Because the Select Committee Is Not Properly Constituted)

46.     Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–45 as if the same were set forth verbatim herein.

47.     The power of authorized congressional committees to issue subpoenas arises by implication from Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).

48.     The Select Committee, however, is not an authorized congressional committee because it fails to comport with its own authorizing resolution, House Resolution 503.

49.     The Speaker of the House failed to appoint members consistent with the authorizing resolution of the Select Committee. The Speaker has appointed only nine Members of Congress to serve on the Select Committee; whereas the authorizing resolution instructs that the Speaker "shall" appoint thirteen members. H. Res. 503 § 2(a), 117th Cong. (2021).

50.     Further, of those nine Members the Speaker has appointed, none of them was appointed after consultation with the Minority Leader, as is required by Section 2(a) of the authorizing resolution.

51.     The composition and membership of a purported committee, including the Select Committee, is material to its power to act. A committee's composition and membership can determine the direction of an inquiry and can serve to check, or temper, committee actions that could otherwise prove injurious to the operation of the government or the rights of private citizens. A committee that, without any check, exclusively serves the political purposes of one political party or faction is susceptible to grave constitutional error and overreach.

52.     Here, the Select Committee has embarked upon an investigation that began with an inquiry into January 6th, but, in the absence of any tempering influence from the opposition party, has transformed into a broad assault on the Select Committee's political opponents, including private citizens.

53.     The Select Committee's failure to ever become properly constituted is a material violation of its authorizing Resolution. A private citizen aggrieved by a material violation of House rules has a defense against compulsory process. In *Yellin v. United States*, 374 U.S. 109, 114 (1963), the House Unamerican Affairs Committee failed to follow Rule IV, which required the committee to weigh certain considerations and act upon the express request of Yellin, the witness, for executive session because he believed his public testimony would harm his reputation. The

Court held that because the committee had not followed Rule IV, Yellin could not be convicted for contempt of Congress for failing to answer questions about his political affiliation and activities. It was not necessary to the Court's decision in *Yellin* that the committee would or should have granted Yellin's request for private, executive session testimony; the holding rests upon the committee's failure to actually apply Rule IV in considering his request. As *Yellin* shows, then, the House's failure to follow a rule is particularly significant where a person's fundamental rights are involved. That is the case here, where Plaintiffs' First and Fourth Amendment rights have been placed under continual pressure since the first round of subpoenas.

54.     Thus, because the Select Committee as it currently stands—and stood at the time it issued the Subpoenas in question—is not a duly constituted Select Committee under the applicable Resolution, it has no authority to act by issuing compulsory process against private entities and citizens. Chairman Thompson's subpoenas are invalid and unenforceable.

**Count II**
**(Subpoena Is Not Pertinent to the Authorized Inquiry)**

55.     Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–54 as if the same were set forth verbatim herein

56.     The Select Committee's supposed inquiry focuses on the events of January 6 leading up to the Capitol breach, factors that may have caused individuals to enter the Capitol without permission, and the statutory process of certifying states' electoral votes.

57.     These four Plaintiffs were vendors for one peaceful event that took place over a few hours away from the Capitol and earlier on the day of January 6, 2021. The Plaintiffs' cell phone account information cannot aid Congress in drafting legislation about the January 6 Capitol breach, its causes, or the statutory process for transferring power. The same is true of the Plaintiffs' complete record of phone calls and texts, the time spent conferring with various individuals who

are political and personal associates of Plaintiffs, and their location data over a three-month stretch of time, long before and long after the events of January 6.

58.     The theory of Congress in investigating Plaintiffs is that they each had some role as outside vendors for the Ellipse Rally at which President Trump spoke. There was no evidence adduced from any Plaintiff, and upon information and belief there is no evidence from any witness, that these Plaintiffs participated in or planned to organize an attack on the Capitol. Nor was there any evidence that these Plaintiffs participated in or planned even a peaceful assembly—a "march," copying the parlance of numerous public gatherings held on the National Mall—to the Capitol.

59.     There was no evidence from these Plaintiffs, and upon information and belief, there was no evidence from any other witness, that these Plaintiffs participated in or planned speeches that were directed to, and were likely to, incite any kind of imminent unlawful activity.

60.     And there was no evidence from these Plaintiffs, and upon information and belief there was no evidence from any other witness, that anyone's speech at the Ellipse Rally actually led to an atmosphere of hatred, violence, or lawlessness, sufficient to cause otherwise peaceful attendees to surge to the Capitol and break in.

61.     The Select Committee claims to have already spoken with over 250 witnesses. See https://january6th.house.gov/news/press-releases/thompson-cheney-opening-statements-rules-committee-meeting-0. Upon information and belief, it has reviewed hundreds of thousands or millions of documents that it has received from those witnesses. It is far past the outset of its investigation, and it is long past time for the Select Committee to have adduced the kind of evidence relating to the Plaintiffs that would suggest they are core subjects of the investigation, justifying the unusual step of Congressional subpoenas for phone records.

62.     Further, Congress has already received a production of records from each Plaintiff and has had as much time as it wanted—many hours at a time, with multiple counsel and staff asking questions at the same time—to interview each Plaintiff. There is no reason to believe these Plaintiffs still have personal knowledge about the Ellipse Rally that was not fully explored in the document review or interviews. There is no reason to believe that the full record of personal and political contacts of each Plaintiff, extending for nearly two months before the Rally (long before it was even a remote possibility) and continuing for a month afterwards, is necessary to supplement their fulsome explanation of the events of the Rally and leading up to it.

63.     It is significant that the Verizon Subpoena uniformly asks for three months of phone records for a large number of people, some of whom touch upon the Committee's inquiry for only a few says. These Plaintiffs did not learn of the potential for what became the Rally until after Christmas, and their involvement in break-down of the stage, collection of fees, and the like was largely complete on the day of (January 6), or a few days after, the Rally. Plaintiff Mulvaney's complete involvement barely spanned one week. Yet the same uniform 3-month request was used for all of these Plaintiffs and, apparently, countless others.

64.     Plaintiffs' personal account information, and the complete record of their private phone and text contacts with all of their political and personal acquaintances for three months, is not pertinent to any inquiry into what happened on January 6, or its causes. Instead, it is an impermissible attempt to harass the Plaintiffs, identify their close colleagues, and potentially subject even those individuals and their carriers to subpoenas. Not only does this chill communication among these friends and political associates, it builds an opposition research file for the 2022 election cycle for the single party that mans, staffs, and controls the Select Committee.

65.     The "phone records" stage of the Select Committee's inquiry is not pertinent to the matters the House assigned to the Select Committee. *See, e.g., Watkins v. United States*, 354 U.S. 178, 207-208 (1957) (the specific demand must be "pertinent to the question under inquiry"). For this reason alone, the Subpoenas should be quashed.

## Count III
### (Subpoena Lacks a Legislative Purpose)

66.     Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–65 as if the same were set forth verbatim herein

67.     A subpoena must not only be pertinent to the matter under investigation, it must be directed to produce facts relevant to subject on which legislation may be had. *Trump v. Mazars USA, LLP,* 140 S.Ct. 2019, 2031, 207 L.Ed.2d 951 (2020) (regardless of whether a congressional subpoena is directed to the Executive branch or a private citizen, it must "concern[] a subject on which legislation could be had," and cannot "expose for the sake of exposure" or serve the purpose of "law enforcement").

68.     The House originally suggested that its inquiry into the "causes" of January 6 was intended to support potential legislation relating to Capitol security and the process of certifying electoral votes on January 6. More recently, it supplemented its list, claiming to be interested in passing legislation on "election integrity."

69.     In response to this Complaint and a stiffening legal response from other targets of compelled disclosure of purely private affairs, the Select Committee might suggest new legislative purposes. But no conceivable area of election-related legislation justifies the compelled disclosure of purely private affairs. Congress does not truly lack the necessary background factual record, and it does not need to threaten private citizens with jail time so that it can craft wise election legislation. For example, the Select Committee may claim that we can minimize the risk of another

January 6 by banning or limiting rallies such as those that occurred such as Ellipse and elsewhere, or by banning or limiting criticisms of election processes after the election. First, any such legislation would need to be within Congress's power under the First Amendment, a stumbling block to any sort of prior restraint or viewpoint or content-based restriction on speech or assembly. Second, assuming for the sake of argument that any such constitutionally-permissible legislation can be conceived, it would necessarily cover an exceedingly narrow field. Within that field, Congress does not truly lack the information it needs to legislate. For example, with respect to these Plaintiffs, everything that happened and was said at the Ellipse Rally—everything needed to craft constitutionally-permissible restrictions on rallies, if they are in fact needed—has long been a matter of public record. Whether the legislative purpose is Capitol security or election integrity, rally participants' purely private communications about lawful, peaceable activity are not part of the pertinent inquiry.

70.     Additionally, even if it were true that any of these legislative purposes are actually being explored by the Select Committee, they do not have any relationship to the Plaintiffs' phone records. There is no conceivable link—even a highly attenuated chain—between, say, the account and payment information from Plaintiffs, and any Capitol security measures that may be passed. The same is true of the months-long list of personal and political contacts and associates that the Subpoenas will yield. Rather than aiding Congress in weighing some hypothetical legislation, the contact information will be used to further harass Plaintiffs, chill their association with personal and political acquaintances, build an opposition research file for 2022 for the party that completely runs the Select Committee without any involvement from the minority, and chill talented people from lending their skills to the Select Committees' political opponents. Because "recipients of legislative subpoenas retain their constitutional rights throughout the course of an investigation,"

*Mazars*, 140 S.Ct. at 2031, this abuse of Congressional power renders the Subpoenas unenforceable.

## Count IV
### (Subpoena Violates the First Amendment Privilege)

71.     Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–70 as if the same were set forth verbatim herein.

72.     The First Amendment creates a "right to associate for the purpose of speaking," *Rumsfeld v. FAIR*, 547 U.S. 47, 68 (2006), and "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958); *Bates v. Little Rock*, 361 U.S. 516, 523 (1960) ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute an effective restraint on freedom of association.") (brackets, ellipsis, & citation omitted).

73.     In cases of compelled disclosure, the Government must meet at least "exacting scrutiny," meaning that it must articulate a sufficiently important interest and show that the disclosure requirement is both substantially related to, and narrowly tailored to serve, that interest. *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 210 L. Ed. 2d 716 (2021). "Exacting scrutiny is triggered by state action which may have the effect of curtailing the freedom to associate, and by the possible deterrent effect of disclosure." *Id*. at 2388 (quotations and citations omitted).

74.     "Narrow tailoring is crucial where First Amendment activity is chilled–even if indirectly– '[b]ecause First Amendment freedoms need breathing space to survive.'" *Id*. at 2384 (citing *NACCP v. Button*, 371 U.S. 415, 433 (1963)).

75.     The First Amendment Privilege does not only provide protection against Congressional legislation or against local abuses of authority, it provides protection against Congressional attacks on First Amendment association via investigations. *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539 (1963) (applying the First Amendment, holding that the legislature could not seek the membership list of a legitimate organization because it had no subordinating interest which was compelling); *Watkins v. United States*, 354 U.S. 178, 197-198 (1957) ("the mere summoning of a witness and compelling him to testify, against his will, about his beliefs, expressions or associations is a measure of governmental interference" and can chill the witness and others from future speech and association).

76.     Subpoenas to indiscriminately force disclosure of Plaintiffs' personal and political associates over a three-month period are precisely the types of invasive inquiries that the Supreme Court has previously recognized can chill the exercise of First Amendment freedoms.

77.     Further, this is not a situation such as *Bonta*, where the government claimed it would comply with a legal duty not to disclose the compelled information. Here, the Select Committee has publicized much of what has been disclosed, and has been active in the media in attempting to whip up sentiment against witnesses. There is no reason to believe that the information produced will be kept private or used only for limited purposes. Rather, the Plaintiffs' personal and political contacts may well find that they are the next to receive subpoenas.

78.     For the reasons discussed above, the Subpoena—coming after complete document productions and prolonged interviews that lasted as long as the Select Committee desired—does not appear to advance any legitimate government informational interest. And if the Select Committee has any remnant of an informational interest in learning these Plaintiffs' personal and political contacts, the three-month period of inquiry, apparently uniformly applied to all witnesses

regardless of their role or connection to the investigation, is by definition not narrowly tailored to that remnant of an interest. For that reason, the Subpoenas violate the Plaintiffs' First Amendment Privilege and should not be enforced.

**Count V**
**(Subpoena Violates the Fourth Amendment)**

79.     Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–78 as if the same were set forth verbatim herein.

80.     Under the Fourth Amendment, Plaintiffs each have a reasonable expectation of privacy in information about who their personal and political contacts are, and how long they spoke with each of them. That is, the Plaintiffs and the public at large do not expect that Congress can simply obtain from their carriers, and then potentially disclose, their entire personal and political contact history and location history over a three-month period.

81.     Congress violated that reasonable expectation of privacy by indiscriminately seeking a mass of phone and text records that cannot have anything to do with the Capitol breach, the Ellipse Rally, or politics.

82.     The Subpoenas should not be enforced as violative of the Fourth Amendment. *See Carpenter v. United States*, 138 S.Ct. 2206, 201 L.Ed.2d 507 (2018).

**Count VI**
**(The Subpoena Violates the Stored Communications Act to the Extent it Seeks Content)**

83.     Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–82 as if the same were set forth verbatim herein.

84.     Here, the Subpoena may seek the actual content of communications, such as the content of texts transmitted by the carrier. They seek "all call, message (SMS & MMS), Internet Protocol ("IP"), and data-connection detail records associated with the Phone Numbers…" If

contents of texts are "message… records" that are "associated with" the phone number of a Plaintiff, then the Subpoena does in fact request content.

85.     Upon information and belief, the Select Committee previously asked Defendant Verizon to preserve a copy of the content of each Plaintiff's communications until further notice. On information and belief, the Select Committee would not have made this request that content be copied and preserved if it did not intend to subpoena content.

86.     Under the Stored Communications Act ("SCA"), Congress has no authority to subpoena content from a carrier. See 18 U.S.C. §2702(a) and (b). Although content can be disclosed to a "governmental entity" under specific, narrow circumstances, Congress is not a "governmental entity" because, as the legislative branch, it is not a "department or agency of the United States." 18 U.S.C. §2711(4). And no other provision in the SCA allows Congress to access content.

87.     Accordingly, to the extent the Subpoena seeks content of the Plaintiffs' communications that is held by Defendant Verizon, it should be declared invalid and Defendant should be enjoined from producing any such content.

**Count VII**
**(Congress Violated the Stored Communications Act by Demanding a Copy Be Made of the Relevant Data)**

88.     Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–87 as if the same were set forth verbatim herein.

89.     The Special Committee requested that Defendant and other carriers make a backup copy of content and other account data in late August or early September 2021. At that time, upon information and belief, Verizon had one year of data regarding Plaintiffs' texts, calls, and location.

90.     Under the Stored Communications Act, Congress had no authority to make such a request. Only a government entity can request backup and preservation of account data. 18 U.S.C. §2703(f). That request can be honored for no more than 90 days, and then may be renewed for an additional 90 days upon the government entity's request. *Id*. Congress is not a government entity under the SCA.

91.     Upon information and belief, Congress, knowing it lacked authority, attempted to coerce Defendant and other entities into silence by requesting that they not tell account holders of the request.

92.     Upon information and belief, Defendant made such a backup copy of Plaintiffs' data under pressure from Congress in late August or early September 2021. As a result of that action, data that Plaintiffs reasonably expected would otherwise have been deleted after one year, in the ordinary course of Verizon's business, was preserved. This included data from November 1, 2020 to November 24, 2020, or approximately the date that was one year before the Subpoena was served.

93.     For the reasons set forth in Counts I to VI, Congress had no authority to request Plaintiffs' data at all, with or without a further request to make a backup copy. The only purpose of a backup copy is to provide the means for Congress to obtain what it cannot lawfully receive. To the extent such a copy was made in August or September 2021, it allowed Congress to obtain information within the Subpoena window that would otherwise have been destroyed. That data should now be destroyed and Plaintiffs' call, text, and location data should not be preserved other than for the one-year period Verizon observes in the ordinary course of business.

**Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against the Defendant as follows:

1. A declaratory judgment that the Subpoenas are invalid and unenforceable;

2. A permanent injunction quashing the Subpoenas;

3. A permanent injunction prohibiting Defendant from disclosing, revealing, delivering, or producing the requested information, or otherwise complying with the Subpoenas;

4. A permanent injunction requiring Defendant to destroy and refrain from producing any copy of Plaintiffs' account data that was made, or that would be produced, in violation of the Stored Communications Act;

5. Plaintiffs' reasonable costs and expenses, including attorneys' fees; and

6. All other preliminary and permanent relief to which Plaintiffs are entitled.

Dated: December 13, 2021                    Respectfully submitted,

**KING MOENCH HIRNIAK MEHTA &**            **GRAVES GARRETT, LLC**
**COLLINS, LLP**

*/s/ Matthew C. Moench*                      */s/ Edward D. Greim*
Matthew C. Moench, Esq. (031462007)         Edward D. Greim (Mo. Bar #54034)*
51 Gibraltar Drive, Suite 2F                Paul Brothers
Morris Plains, New Jersey 07950-1254        1100 Main Street, Suite 2700
973-998-6860                                Kansas City, MO 64105
973-998-6863 (facsimile)                    Phone: (816) 256-3181
MCM@kmhmlawfirm.com                         Fax: (816) 256-5958
                                            edgreim@gravesgarrett.com

                                            *Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiffs*

24

# EXHIBIT A



VERIZON SECURITY SUBPOENA COMPLIANCE
180 WASHINGTON VALLEY ROAD
BEDMINSTER NJ 07921
Phone: 888-483-2600 Fax: 325-949-6916

December 2, 2021

ORAL DYNAMIC LAB OF UTICA
C/O PASQUALE CAPORALE
1322 SUNSET AVE
UTICA, NY, 13502-4722

Verizon Case #: 21521385
Docket / File #: House Subcommittee 11 24 21
Phone Number: 315-794-7950

Dear Customer,

This is to notify you that Verizon has received a subpoena requiring the production of certain records associated with the phone number referenced above.  According to our records, you are the subscriber of that phone number.

A copy of the subpoena is attached.  Section B, which identifies the phone number referenced above but also those of other Verizon subscribers, has been excluded.

Any questions you have should be directed to the party who issued the subpoena.

Please be advised that unless Verizon receives a court document challenging the subpoena by December 15, 2021, Verizon is compelled to comply with the subpoena.  Copies of any court documents challenging the subpoena can be sent to Verizon via fax number 325-949-6916.


Very truly yours,


VERIZON SECURITY SUBPOENA COMPLIANCE


Enclosure

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Verizon
Attn: VSAT
_____

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol
_____

of the House of Representatives of the United States at the place, date, and time specified below.

[✓] **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 1540A Longworth House Office Building, Washington, DC 20515

Date: December 8, 2021          Time: 10:00 a.m.

[ ] **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony:_____

Date:_____          Time _____

[ ] **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony:_____

Date:_____          Time _____

*To* any authorized staff member or the United States Marshals Service
_____
_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 24th  day of November , 2021 .

_____
*Chairman or Authorized Member*

Attest: _____
*Clerk*

## SCHEDULE

In accordance with the attached definitions and instructions, you, Verizon, are hereby required to produce the documents and records ("Records") listed in Section A, below, **for the time period November 1, 2020, to January 31, 2021**, concerning the phone numbers listed in Section B, below (the "Phone Numbers").

**Please email the records to SELECT_CLERKS@MAIL.HOUSE.GOV** or, in the alternative, send them by mail to 1540A Longworth House Office Building, Washington, DC 20515, care of Jacob Nelson, Select Committee to Investigate the January 6th Attack on the U.S. Capitol.

## Section A -- Records to Be Produced for Each Phone Number

1. Subscriber Information: All subscriber information for the Phone Number, including:

    a. Name, subscriber name, physical address, billing address, e-mail address, and any other address and contact information;

    b. All authorized users on the associated account;

    c. All phone numbers associated with the account;

    d. Length of service (including start date) and types of service utilized;

    e. Telephone or instrument numbers (including MAC addresses), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN") Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI") associated with the accounts;

    f. Activation date and termination date of each device associated with the account;

    g. Any and all number and/or account number changes prior to and after the account was activated;

    h. Other subscriber numbers or identities (including temporarily assigned network addresses and registration Internet Protocol ("IP") addresses); and

2. Connection Records and Records of Session Times and Durations: All call, message (SMS & MMS), Internet Protocol ("IP"), and data-connection detail records associated with the Phone Numbers, including all phone numbers, IP addresses, or devices that communicated with the Phone Number via delivered and undelivered inbound, outbound, and routed calls, messages, voicemail, and data connections.

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1. In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2. Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee').

3. In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4. The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5. Electronic document productions should be prepared according to the following standards:

   a. If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

   b. All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

      BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6.    Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7.    Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8.    When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9.    The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10.   The pendency of or potential for litigation shall not be a basis to withhold any information.

11.   In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12.   Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13.   If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14.   In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15.   If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16.   If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17. This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18. All documents shall be Bates-stamped sequentially and produced sequentially.

19. Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.     The term "communication" means each manner or means of disclosure or
       exchange of information, regardless of means utilized, whether oral, electronic,
       by document or otherwise, and whether in a meeting, by telephone, facsimile,
       mail, releases, electronic message including email (desktop or mobile device), text
       message, instant message, MMS or SMS message, message application, through a social
       media or online platform, or otherwise.

3.     The terms "and" and "or" shall be construed broadly and either conjunctively or
       disjunctively to bring within the scope of this request any information that might
       otherwise be construed to be outside its scope. The singular includes plural number,
       and vice versa. The masculine includes the feminine and neutral genders.

4.     The term "including" shall be construed broadly to mean "including, but not limited
       to."

5.     The term "Company" means the named legal entity as well as any units, firms,
       partnerships, associations, corporations, limited liability companies, trusts,
       subsidiaries, affiliates, divisions, departments, branches, joint ventures,
       proprietorships, syndicates, or other legal, business or government entities over
       which the named legal entity exercises control or in which the named entity has any
       ownership whatsoever.

6.     The term "identify," when used in a question about individuals, means to
       provide the following information: (a) the individual's complete name and title;
       (b) the individual's business or personal address and phone number; and (c)
       any and all known aliases.

7.     The term "related to" or "referring or relating to," with respect to any given
       subject, means anything that constitutes, contains, embodies, reflects, identifies,
       states, refers to, deals with, or is pertinent to that subject in any manner
       whatsoever.

8.     The term "employee" means any past or present agent, borrowed employee,
       casual employee, consultant, contractor, de facto employee, detailee,
       assignee, fellow, independent contractor, intern, joint adventurer, loaned
       employee, officer, part-time employee, permanent employee, provisional
       employee, special government employee, subcontractor, or any other type of
       service provider.

9.     The term "individual" means all natural persons and all persons or entities
       acting on their behalf.

# EXHIBIT B



VERIZON SECURITY SUBPOENA COMPLIANCE
180 WASHINGTON VALLEY ROAD
BEDMINSTER NJ 07921
Phone: 888-483-2600 Fax: 325-949-6916

December 2, 2021

TIMOTHY UNES
8421 MASTERS CT
ALEXANDRIA, VA, 22308-2226

Verizon Case #: 21521385
Docket / File #: House Subcommittee 11 24 21
Phone Number: 202-258-3306

Dear Customer,

This is to notify you that Verizon has received a subpoena requiring the production of certain records associated with the phone number referenced above. According to our records, you are the subscriber of that phone number.

A copy of the subpoena is attached. Section B, which identifies the phone number referenced above but also those of other Verizon subscribers, has been excluded.

Verizon received a letter from Edward Greim and Paul Brothers regarding your account, and a copy of this notification letter is being sent to them as well.

Any questions you have should be directed to the party who issued the subpoena.

Please be advised that unless Verizon receives a court document challenging the subpoena by December 15, 2021, Verizon is compelled to comply with the subpoena. Copies of any court documents challenging the subpoena can be sent to Verizon via fax number 325-949-6916.


Very truly yours,


VERIZON SECURITY SUBPOENA COMPLIANCE


Enclosure

Cc: Edward Greim; Paul Brothers

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To*  Verizon
Attn: VSAT
_____

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol
_____

of the House of Representatives of the United States at the place, date, and time specified below.

[✓] **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 1540A Longworth House Office Building, Washington, DC 20515

Date: December 8, 2021 _____      Time: 10:00 a.m. _____

[ ] **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony:_____

Date: _____      Time _____

[ ] **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____      Time _____

*To* any authorized staff member or the United States Marshals Service
_____
_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 24th day of November , 20 21 .

_____
*Chairman or Authorized Member*

Attest: _____

*Clerk*

## SCHEDULE

In accordance with the attached definitions and instructions, you, Verizon, are hereby required to produce the documents and records ("Records") listed in Section A, below, **for the time period November 1, 2020, to January 31, 2021,** concerning the phone numbers listed in Section B, below (the "Phone Numbers").

**Please email the records to SELECT_CLERKS@MAIL.HOUSE.GOV** or, in the alternative, send them by mail to 1540A Longworth House Office Building, Washington, DC 20515, care of Jacob Nelson, Select Committee to Investigate the January 6th Attack on the U.S. Capitol.

**Section A – Records to Be Produced for Each Phone Number**

1.   Subscriber Information: All subscriber information for the Phone Number, including:

   a.   Name, subscriber name, physical address, billing address, e-mail address, and any other address and contact information;

   b.   All authorized users on the associated account;

   c.   All phone numbers associated with the account;

   d.   Length of service (including start date) and types of service utilized;

   e.   Telephone or instrument numbers (including MAC addresses), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN") Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI") associated with the accounts;

   f.   Activation date and termination date of each device associated with the account;

   g.   Any and all number and/or account number changes prior to and after the account was activated;

   h.   Other subscriber numbers or identities (including temporarily assigned network addresses and registration Internet Protocol ("IP") addresses); and

2.   Connection Records and Records of Session Times and Durations: All call, message (SMS & MMS), Internet Protocol ("IP"), and data-connection detail records associated with the Phone Numbers, including all phone numbers, IP addresses, or devices that communicated with the Phone Number via delivered and undelivered inbound, outbound, and routed calls, messages, voicemail, and data connections.

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1.  In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.  Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee').

3.  In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.  The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.  Electronic document productions should be prepared according to the following standards:

    a.  If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

    b.  All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

    BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6.  Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7.  Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8.  When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9.  The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10. The pendency of or potential for litigation shall not be a basis to withhold any information.

11. In accordance with 5 U.S.C. § 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13. If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14. In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15. If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16. If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17. This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18. All documents shall be Bates-stamped sequentially and produced sequentially.

19. Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.   The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases,  electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3.   The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4.   The term "including" shall be construed broadly to mean "including, but not limited to."

5.   The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.   The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.   The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.   The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.   The term "individual" means all natural persons and all persons or entities acting on their behalf.

# EXHIBIT C



VERIZON SECURITY SUBPOENA COMPLIANCE
180 WASHINGTON VALLEY ROAD
BEDMINSTER NJ 07921
Phone: 888-483-2600 Fax: 325-949-6916

December 2, 2021

MAGGIE MULVANEY
1211 13TH ST NW APT 10518
WASHINGTON, DC, 20005-5246

Verizon Case #: 21521385
Docket / File #: House Subcommittee 11 24 21
Phone Number: 651-233-7862

Dear Customer,

This is to notify you that Verizon has received a subpoena requiring the production of certain records associated with the phone number referenced above. According to our records, you are the subscriber of that phone number.

A copy of the subpoena is attached. Section B, which identifies the phone number referenced above but also those of other Verizon subscribers, has been excluded.

Verizon received a letter from Edward Greim and Paul Brothers regarding your account, and a copy of this notification letter is being sent to them as well.

Any questions you have should be directed to the party who issued the subpoena.

Please be advised that unless Verizon receives a court document challenging the subpoena by December 15, 2021, Verizon is compelled to comply with the subpoena. Copies of any court documents challenging the subpoena can be sent to Verizon via fax number 325-949-6916.

Very truly yours,

VERIZON SECURITY SUBPOENA COMPLIANCE

Enclosure

Cc: Edward Greim; Paul Brothers

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To*  Verizon
Attn: VSAT
_____

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol
_____

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production: 1540A Longworth House Office Building, Washington, DC 20515
>
> Date: December 8, 2021                          Time: 10:00 a.m.

☐ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony:_____
>
> Date: _____          Time _____

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____          Time _____

*To* any authorized staff member or the United States Marshals Service
_____
_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 24th  day of November              , 2021 .

_____
Chairman or Authorized Member

Attest: _____

*Clerk*

## SCHEDULE

In accordance with the attached definitions and instructions, you, Verizon, are hereby required to produce the documents and records ("Records") listed in Section A, below, **for the time period November 1, 2020, to January 31, 2021,** concerning the phone numbers listed in Section B, below (the "Phone Numbers").

**Please email the records to SELECT_CLERKS@MAIL.HOUSE.GOV** or, in the alternative, send them by mail to 1540A Longworth House Office Building, Washington, DC 20515, care of Jacob Nelson, Select Committee to Investigate the January 6th Attack on the U.S. Capitol.

**Section A – Records to Be Produced for Each Phone Number**

1.   Subscriber Information: All subscriber information for the Phone Number, including:

   a.   Name, subscriber name, physical address, billing address, e-mail address, and any other address and contact information;

   b.   All authorized users on the associated account;

   c.   All phone numbers associated with the account;

   d.   Length of service (including start date) and types of service utilized;

   e.   Telephone or instrument numbers (including MAC addresses), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN") Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI") associated with the accounts;

   f.   Activation date and termination date of each device associated with the account;

   g.   Any and all number and/or account number changes prior to and after the account was activated;

   h.   Other subscriber numbers or identities (including temporarily assigned network addresses and registration Internet Protocol ("IP") addresses); and

2.   Connection Records and Records of Session Times and Durations: All call, message (SMS & MMS), Internet Protocol ("IP"), and data-connection detail records associated with the Phone Numbers, including all phone numbers, IP addresses, or devices that communicated with the Phone Number via delivered and undelivered inbound, outbound, and routed calls, messages, voicemail, and data connections.

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1.    In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.    Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee").

3.    In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.    The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.    Electronic document productions should be prepared according to the following standards:

   a.    If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

   b.    All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

      BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6.      Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7.      Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8.      When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9.      The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10.     The pendency of or potential for litigation shall not be a basis to withhold any information.

11.     In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12.     Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13.     If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14.     In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15.     If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16.     If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17. This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18. All documents shall be Bates-stamped sequentially and produced sequentially.

19. Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2. The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3. The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4. The term "including" shall be construed broadly to mean "including, but not limited to."

5. The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6. The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7. The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8. The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9. The term "individual" means all natural persons and all persons or entities acting on their behalf.

# EXHIBIT D



VERIZON SECURITY SUBPOENA COMPLIANCE
180 WASHINGTON VALLEY ROAD
BEDMINSTER NJ 07921
Phone: 888-483-2600 Fax: 325-949-6916

December 2, 2021

MICHAEL POWERS
18300 JOHNSON RD
TRIANGLE, VA, 22172-1608

Verizon Case #: 21521385
Docket / File #: House Subcommittee 11 24 21
Phone Number: 703-780-9394

Dear Customer,

This is to notify you that Verizon has received a subpoena requiring the production of certain records associated with the phone number referenced above.  According to our records, you are the subscriber of that phone number.

A copy of the subpoena is attached.  Section B, which identifies the phone number referenced above but also those of other Verizon subscribers, has been excluded.

Any questions you have should be directed to the party who issued the subpoena.

Please be advised that unless Verizon receives a court document challenging the subpoena by December 15, 2021, Verizon is compelled to comply with the subpoena.  Copies of any court documents challenging the subpoena can be sent to Verizon via fax number 325-949-6916.

Very truly yours,

VERIZON SECURITY SUBPOENA COMPLIANCE

Enclosure

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To*  Verizon
Attn: VSAT
_____

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol
_____

of the House of Representatives of the United States at the place, date, and time specified below.

[✓]  **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production: 1540A Longworth House Office Building, Washington, DC 20515
>
> Date: December 8, 2021          Time: 10:00 a.m.

[ ]  **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony:_____
>
> Date: _____          Time _____

[ ]  **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____          Time _____

*To* any authorized staff member or the United States Marshals Service
_____
_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 24th   day of November       , 20 21 .

Attest: *Kevin McCulver*                    *Bennie G Thompson*
_____                    _____
*Clerk*                                   *Chairman or Authorized Member*

## SCHEDULE

In accordance with the attached definitions and instructions, you, Verizon, are hereby required to produce the documents and records ("Records") listed in Section A, below, **for the time period November 1, 2020, to January 31, 2021**, concerning the phone numbers listed in Section B, below (the "Phone Numbers").

**Please email the records to SELECT_CLERKS@MAIL.HOUSE.GOV** or, in the alternative, send them by mail to 1540A Longworth House Office Building, Washington, DC 20515, care of Jacob Nelson, Select Committee to Investigate the January 6th Attack on the U.S. Capitol.

**Section A – Records to Be Produced for Each Phone Number**

1.  Subscriber Information: All subscriber information for the Phone Number, including:

    a.  Name, subscriber name, physical address, billing address, e-mail address, and any other address and contact information;

    b.  All authorized users on the associated account;

    c.  All phone numbers associated with the account;

    d.  Length of service (including start date) and types of service utilized;

    e.  Telephone or instrument numbers (including MAC addresses), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN") Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI") associated with the accounts;

    f.  Activation date and termination date of each device associated with the account;

    g.  Any and all number and/or account number changes prior to and after the account was activated;

    h.  Other subscriber numbers or identities (including temporarily assigned network addresses and registration Internet Protocol ("IP") addresses); and

2.  Connection Records and Records of Session Times and Durations: All call, message (SMS & MMS), Internet Protocol ("IP"), and data-connection detail records associated with the Phone Numbers, including all phone numbers, IP addresses, or devices that communicated with the Phone Number via delivered and undelivered inbound, outbound, and routed calls, messages, voicemail, and data connections.

**DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS**

1. In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2. Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee").

3. In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4. The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5. Electronic document productions should be prepared according to the following standards:

   a. If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

   b. All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

   BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6.  Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7.  Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8.  When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9.  The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10.  The pendency of or potential for litigation shall not be a basis to withhold any information.

11.  In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12.  Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13.  If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14.  In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15.  If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16.  If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17.     This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18.     All documents shall be Bates-stamped sequentially and produced sequentially.

19.     Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1.     The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.  The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3.  The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4.  The term "including" shall be construed broadly to mean "including, but not limited to."

5.  The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.  The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.  The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.  The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.  The term "individual" means all natural persons and all persons or entities acting on their behalf.

# EXHIBIT E

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

Justin Caporale

*To* _____

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol

of the House of Representatives of the United States at the place, date, and time specified below.

[✓] **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 1540A Longworth House Office Building, Washington, DC 20515

Date: October 13, 2021                          Time: 10:00 a.m.

[✓] **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: 1540A Longworth House Office Building, Washington, DC 20515

Date: October 25, 2021                          Time: 2:00 p.m.

[ ] **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____                          Time _____

*To* any authorized staff member or the U.S. Marshals Service _____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 29th      day of September          , 20 21

_____
*Chairman or Authorized Member*

Attest: _____
*Clerk*

# PROOF OF SERVICE

Subpoena for  Justin Caporale

Address  1801 Park Rd NW Apt. 2, Washington, DC 20010

before the  Select Committee to Investigate the January 6th Attack on the United States Capitol

*U.S. House of Representatives*
*117th Congress*

Served by (print name) _____

Title _____

Manner of service _____

_____

Date _____

Signature of Server _____

Address _____

_____



**BENNIE G. THOMPSON, MISSISSIPPI**
**CHAIRMAN**

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, FLORIDA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
*LIZ CHENEY, WYOMING*
*ADAM KINZINGER, ILLINOIS*

U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225–7800

## One Hundred Seventeenth Congress
## Select Committee to Investigate the January 6th Attack on the United States Capitol

September 29, 2021

<u>VIA US and ELECTRONIC MAIL</u>

Justin Caporale
Director of Operations /Senior Vice President
Event Strategies, Inc.
510 King St Ste 410
Alexandria, VA, 22314 – 3132
justin@eventstrategiesinc.com

Dear Mr. Caporale:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena that compels you to produce the documents set forth in the accompanying Schedules A and B by October 13, 2021, and to appear for a deposition on October 25, 2021.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures rules, or regulations. The inquiry includes examination of how various individuals and entities coordinated their activities leading up to the events of January 6, 2021.

The investigation has revealed credible evidence of your involvement in events within the scope of the Select Committee's inquiry. According to documents provided to the Select Committee, press reports, and statements by Women for America First ("WFAF"), you assisted in organizing the rally held on the Ellipse in Washington, D.C. on January 6, 2021, in support of then-President Trump and his allegations of election fraud. President Trump spoke at that rally shortly before the attack on the Capitol, urging the crowd to "fight much harder" and to "stop the steal."[1] On the same day that WFAF submitted the original permit application for the January 6th

---

[1] Documents on file with the Select Committee; Joseph Tanfani, Michael Berens & Ned Parker, *How Trump's pied pipers rallied a faithful mob to the Capitol* (Reuters, Jan. 11, 2021), https://www.reuters.com/article/us-usa-trump-protest-organizers-insight/how-trumps-pied-pipers-rallied-a-faithful-mob-to-the-capitol-idUSKBN29G2UP; Women for America First homepage, *March for Trump*, https://wfaf.org/ (describing post-election rallies organized by Women for America First in support of President Trump); Women for America First, *Women for America First Statement on the Sham January 6th Commission* (July 21, 2021), https://wfaf.org/news/sham-commission/ (quoting Amy Kremer: "As head of the organization who sponsored the President's speech at the Ellipse, I would be happy to testify about the events leading up to and during that day, something I have never been asked to do by the Democrats in Congress").

Mr. Justin Caporale
Page 2

rally on behalf of WFAF, President Trump tweeted, "Big protest in D.C. on January 6th. Be there, will be wild!"[2] On subsequent permitting paperwork submitted by WFAF, you were listed as one of several designated points of contact for the rally, and described as the "Project Manager."[3] The contact information contained in the permit paperwork included an email address affiliated with your company, Event Strategies, Inc. According to press reports, those working with you and WFAF to organize the January 6th rally collectively communicated with President Trump, White House officials including Chief of Staff Mark Meadows, and others about the rally and other events planned to coincide with the certification of the 2020 Electoral College results.[4] Accordingly, the Select Committee seeks both documents and your deposition testimony regarding these and other matters that are within the scope of the Select Committee's inquiry.

A copy of the rules governing Select Committee depositions, and document production definitions and instructions are attached. Please contact staff for the Select Committee at 202-225-7800 to arrange for the production of documents.

Sincerely,

Bennie G. Thompson
Chairman

---

[2] Documents on file with the Select Committee; Dan Barry & Sheera Frenkel, *"Be There. Will be Wild!": Trump All but Circled the Date*, N.Y. TIMES (Jan. 6, 2021), https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html; Kremer, Kylie Jane [@KylieJaneKremer]. "The calvary is coming, Mr. President! JANUARY 6th | Washington DC http://TrumpMarch.com [U.S. flag emojis] #MarchForTrump #StopTheSteal." Twitter, December 19, 2020 (attaching advertisement for January 6 rally quoting Trump, Donald J. [@realDonaldTrump]. "Peter Navarro releases 36-page report alleging election fraud 'more than sufficient' to swing victory for Trump [link omitted]. A great report by Peter. Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!" Twitter, December 19, 2020), https://twitter.com/KylieJaneKremer/status/1340399063875895296.

[3] Documents on file with the Select Committee.

[4] Joshua Kaplan & Joaquin Sapien, *New Details Suggest Senior Trump Aides Knew Jan. 6 Rally Could Get Chaotic*, PROPUBLICA (June 25, 2021), https://www.propublica.org/article/new-details-suggest-senior-trump-aides-knew-jan-6-rally-could-get-chaotic.

Mr. Justin Caporale
Page 3

## SCHEDULE A

In accordance with the attached Definitions and Instructions, you, Justin Caporale, are hereby required to produce all documents and communications in your possession, custody, or control—including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal accounts, and/or on personal applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to the following items. If no date range is specified below, the applicable dates are for the time period November 1, 2020, to present.

1. For the time period November 1, 2020, to present, all documents and communications concerning the rally Women for America First ("WFAF") held on the Ellipse in Washington, D.C. on January 6, 2021, at which President Donald Trump and others spoke (the "Ellipse Rally"), including but not limited to:

   a. Permit applications for the Ellipse Rally;

   b. Marketing, advertisement, or promotion of the Ellipse Rally;

   c. Sponsorships of the Ellipse Rally;

   d. Funding for the Ellipse Rally;

   e. Security, including but not limited to the identification of and planning for particular security risks, for the Ellipse Rally;

   f. Third-party vendors and service providers for logistics and equipment to be used at the Ellipse Rally;

   g. Agenda and selection of speakers for the Ellipse Rally;

   h. Coordination of the speakers' respective speeches for the Ellipse Rally, including but not limited to discussions of content and messaging;

   i. Attendees of the Ellipse Rally, including but not limited to designation and treatment of VIP attendees;

   j. Travel and accommodations for attendees of the Ellipse Rally, including but not limited to coordination of group travel and funding for the same;

   k. President Donald Trump's involvement in planning for, participation in, and attendance at the Ellipse Rally;

   l. Communications with or concerning President Donald Trump, his family members, advisers, White House staff, or Trump Campaign staff regarding planning for, participation in, or attendance at the Ellipse Rally; and

Mr. Justin Caporale
Page 4

    m.  Communications with or concerning any member or member-elect of Congress, or their respective Congressional or campaign staffs, regarding planning for, participation in, or attendance at the Ellipse Rally.

2.  For the time period November 1, 2020, to present, documents sufficient to identify all email accounts, social media accounts, and websites you used, whether directly or indirectly, to market, advertise, or promote, or otherwise communicate about, the Ellipse Rally.

3.  For the time period November 1, 2020, to present, documents sufficient to identify all telephone numbers you used to communicate about the Ellipse Rally.

4.  For the time period November 1, 2020, through January 31, 2021, documents sufficient to identify all financial accounts ("Financial Accounts") in which you were the direct or indirect beneficial owner, or over which you exercised control, and into which funds were transferred or deposited to compensate or reimburse you for your work in connection with the Ellipse Rally.

5.  For each Financial Account identified in response to Request 4 above, documents sufficient to identify all account transactions for the time period November 1, 2020, to January 31, 2021, in connection with the Ellipse Rally.

6.  For the time period January 6, 2021, to present, all documents and communications concerning the facts and circumstances of the attack on the U.S. Capitol in Washington, D.C. that occurred on January 6, 2021 (the "Capitol Attack").

7.  To the extent not covered by the above requests, for the time period January 6, 2021, to present, all documents and communications provided to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the Ellipse Rally or the Capitol Attack.

8.  For the time period January 6, 2021, to present, all correspondence or communications from or to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the Ellipse Rally or the Capitol Attack.

Mr. Justin Caporale
Page 5

## **SCHEDULE B**

In accordance with the attached Definitions and Instructions, you, Justin Caporale, are hereby required to produce all documents and communications in the possession, custody, or control of Event Strategies, Inc. (the "Entity") to the extent you are a custodian of records for the Entity—including any such documents or communications stored or located on Entity devices (e.g., personal computers, cellular phones, tablets, etc.), in Entity accounts, and/or on Entity applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to the following items. If no date range is specified below, the applicable dates are for the time period November 1, 2020, to present.

1. For the time period November 1, 2020, to present, all documents and communications concerning the rally Women for America First ("WFAF") held on the Ellipse in Washington, D.C. on January 6, 2021, at which President Donald Trump and others spoke (the "Ellipse Rally"), including but not limited to:

   a. Permit applications for the Ellipse Rally;

   b. Marketing, advertisement, or promotion of the Ellipse Rally;

   c. Sponsorships of the Ellipse Rally;

   d. Funding for the Ellipse Rally;

   e. Security, including but not limited to the identification of and planning for particular security risks, for the Ellipse Rally;

   f. Third-party vendors and service providers for logistics and equipment to be used at the Ellipse Rally;

   g. Agenda and selection of speakers for the Ellipse Rally;

   h. Coordination of the speakers' respective speeches for the Ellipse Rally, including but not limited to discussions of content and messaging;

   i. Attendees of the Ellipse Rally, including but not limited to designation and treatment of VIP attendees;

   j. Travel and accommodations for attendees of the Ellipse Rally, including but not limited to coordination of group travel and funding for the same;

   k. President Donald Trump's involvement in planning for, participation in, and attendance at the Ellipse Rally;

   l. Communications with or concerning President Donald Trump, his family members, advisers, White House staff, or Trump Campaign staff regarding planning for, participation in, or attendance at the Ellipse Rally; and

Mr. Justin Caporale
Page 6

    m. Communications with or concerning any member or member-elect of Congress, or their respective Congressional or campaign staffs, regarding planning for, participation in, or attendance at the Ellipse Rally.

2. For the time period November 1, 2020, to present, documents sufficient to identify all social media accounts and websites Event Strategies, Inc. ("Event Strategies") used, whether directly or indirectly, to market, advertise, or promote, or otherwise communicate about, the Ellipse Rally.

3. For the time period November 1, 2020, to present, documents sufficient to identify all telephone numbers used by any employee, officer, or board member of Event Strategies to communicate about the Ellipse Rally.

4. For the time period November 1, 2020, through January 31, 2021, documents sufficient to identify all financial accounts ("Financial Accounts") for which Event Strategies was the direct or indirect beneficial owner, or over which Event Strategies exercised control, and into which funds were transferred or deposited to compensate or reimburse Event Strategies for its work in connection with the Ellipse Rally.

5. For each Financial Account identified in response to Request 4 above, documents sufficient to identify all account transactions for the time period November 1, 2020, to January 31, 2021, in connection with the Ellipse Rally.

6. For the time period January 6, 2021, to present, all documents and communications concerning the facts and circumstances of the attack on the U.S. Capitol in Washington, D.C. that occurred on January 6, 2021 (the "Capitol Attack").

7. To the extent not covered by the above requests, for the time period January 6, 2021, to present, all documents and communications provided to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the Ellipse Rally or the Capitol Attack.

8. For the time period January 6, 2021, to present, all correspondence or communications from or to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the Ellipse Rally or the Capitol Attack.

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1.  In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.  Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee").

3.  In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.  The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.  Electronic document productions should be prepared according to the following standards:

    a.  If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

    b.  All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

    BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6.   Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7.   Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8.   When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9.   The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10.   The pendency of or potential for litigation shall not be a basis to withhold any information.

11.   In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12.   Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13.   If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14.   In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15.   If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16.   If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17.   This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18.   All documents shall be Bates-stamped sequentially and produced sequentially.

19.   Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
      (2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1.   The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.    The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3.    The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4.    The term "including" shall be construed broadly to mean "including, but not limited to."

5.    The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.    The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.    The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.    The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.    The term "individual" means all natural persons and all persons or entities acting on their behalf.

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic devices, shall be carried out in harmony with this policy during the pendency of a covered period.

## 117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,
Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record.

Sincerely,
JAMES P. MCGOVERN,
*Chairman, Committee on Rules.*

REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes, Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

## REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,
Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the CONGRESSIONAL RECORD.

Sincerely,
JAMES P. MCGOVERN,
*Chairman,
Committee on Rules.*

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera. (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.

# EXHIBIT F

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

Tim Unes

*To* _____

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol

_____

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 1540A Longworth House Office Building, Washington, DC 20515

Date: October 13, 2021                              Time: 10:00 a.m.

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: 1540A Longworth House Office Building, Washington, DC 20515

Date: October 25, 2021                              Time: 10:00 a.m.

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____                              Time: _____

*To* any authorized staff member or the U.S. Marshals Service _____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 29th     day of September          , 20 21 .

_____
*Chairman or Authorized Member*

Attest _____

*Clerk*

# PROOF OF SERVICE

Subpoena for  Tim Unes

Address  8421 Masters Ct., Alexandria, VA 22308

before the  Select Committee to Investigate the January 6th Attack on the United States Capitol

*U.S. House of Representatives*
*117th Congress*

Served by (print name)

Title

Manner of service

Date

Signature of Server

Address



**BENNIE G. THOMPSON, MISSISSIPPI**
**CHAIRMAN**

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
*LIZ CHENEY, WYOMING*
*ADAM KINZINGER, ILLINOIS*

U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225–7800

## One Hundred Seventeenth Congress

## Select Committee to Investigate the January 6th Attack on the United States Capitol

September 29, 2021

<u>VIA US and ELECTRONIC MAIL</u>

Tim Unes
Founder / President
Event Strategies, Inc.
510 King St Ste 410
Alexandria, VA, 22314 – 3132
unes@eventstrategiesinc.com

Dear Mr. Unes:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena that compels you to produce the documents set forth in the accompanying Schedules A and B by October 13, 2021, and to appear for a deposition on October 25, 2021.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures rules, or regulations. The inquiry includes examination of how various individuals and entities coordinated their activities leading up to the events of January 6, 2021.

The investigation has revealed credible evidence of your involvement in events within the scope of the Select Committee's inquiry. According to documents provided by to the Select Committee, press reports, and statements by Women for America First ("WFAF"), you assisted in organizing the rally held on the Ellipse in Washington, D.C. on January 6, 2021, in support of then-President Trump and his allegations of election fraud. President Trump spoke at that rally shortly before the attack on the Capitol, urging the crowd to "fight much harder" and to "stop the steal."[1] On the same day that WFAF submitted the original permit application for the January 6th

---

[1] Documents on file with the Select Committee; Joseph Tanfani, Michael Berens & Ned Parker, *How Trump's pied pipers rallied a faithful mob to the Capitol* (Reuters, Jan. 11, 2021), https://www.reuters.com/article/us-usa-trump-protest-organizers-insight/how-trumps-pied-pipers-rallied-a-faithful-mob-to-the-capitol-idUSKBN29G2UP; Women for America First homepage, *March for Trump*, https://wfaf.org/ (describing post-election rallies organized by Women for America First in support of President Trump); Women for America First, *Women for America First Statement on the Sham January 6th Commission* (July 21, 2021), https://wfaf.org/news/sham-commission/ (quoting Amy Kremer: "As head of the organization who sponsored the President's speech at the Ellipse, I would be happy to testify about the events leading up to and during that day, something I have never been asked to do by the Democrats in Congress").

Mr. Tim Unes
Page 2

rally on behalf of WFAF, President Trump tweeted, "Big protest in D.C. on January 6th. Be there, will be wild!"[2] On subsequent permitting paperwork submitted by WFAF, you were described as the "Stage Manager."[3] The contact information in the permitting paperwork included an email address affiliated with your company, Event Strategies, Inc. According to press reports, those working with you and WFAF to organize the January 6th rally collectively communicated with President Trump, White House officials including Chief of Staff Mark Meadows, and others about the rally and other events planned to coincide with the certification of the 2020 Electoral College results.[4] Accordingly, the Select Committee seeks both documents and your deposition testimony regarding these and other matters that are within the scope of the Select Committee's inquiry.

A copy of the rules governing Select Committee depositions, and document production definitions and instructions are attached. Please contact staff for the Select Committee at 202-225-7800 to arrange for the production of documents.

Sincerely,

Bennie G. Thompson
Chairman

---

[2] Documents on file with the Select Committee; Dan Barry & Sheera Frenkel, *"Be There. Will be Wild!": Trump All but Circled the Date*, N.Y. TIMES (Jan. 6, 2021), https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html; Kremer, Kylie Jane [@KylieJaneKremer]. "The calvary is coming, Mr. President! JANUARY 6th | Washington DC http://TrumpMarch.com [U.S. flag emojis] #MarchForTrump #StopTheSteal." Twitter, December 19, 2020 (attaching advertisement for January 6 rally quoting Trump, Donald J. [@realDonaldTrump]. "Peter Navarro releases 36-page report alleging election fraud 'more than sufficient' to swing victory for Trump [link omitted]. A great report by Peter. Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!" Twitter, December 19, 2020), https://twitter.com/KylieJaneKremer/status/1340399063875895296.

[3] Documents on file with the Select Committee.

[4] Joshua Kaplan & Joaquin Sapien, *New Details Suggest Senior Trump Aides Knew Jan. 6 Rally Could Get Chaotic*, PROPUBLICA (June 25, 2021), https://www.propublica.org/article/new-details-suggest-senior-trump-aides-knew-jan-6-rally-could-get-chaotic.

Mr. Tim Unes
Page 3

## SCHEDULE A

In accordance with the attached Definitions and Instructions, you, Tim Unes, are hereby required to produce, all documents and communications in your possession, custody, or control—including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal accounts, and/or on personal applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to the following items. If no date range is specified below, the applicable dates are for the time period November 1, 2020, to present.

1. For the time period November 1, 2020, to present, all documents and communications concerning the rally Women for America First ("WFAF") held on the Ellipse in Washington, D.C. on January 6, 2021, at which President Donald Trump and others spoke (the "Ellipse Rally"), including but not limited to:

    a. Permit applications for the Ellipse Rally;

    b. Marketing, advertisement, or promotion of the Ellipse Rally;

    c. Sponsorships of the Ellipse Rally;

    d. Funding for the Ellipse Rally;

    e. Security, including but not limited to the identification of and planning for particular security risks, for the Ellipse Rally;

    f. Third-party vendors and service providers for logistics and equipment to be used at the Ellipse Rally;

    g. Agenda and selection of speakers for the Ellipse Rally;

    h. Coordination of the speakers' respective speeches for the Ellipse Rally, including but not limited to discussions of content and messaging;

    i. Attendees of the Ellipse Rally, including but not limited to designation and treatment of VIP attendees;

    j. Travel and accommodations for attendees of the Ellipse Rally, including but not limited to coordination of group travel and funding for the same;

    k. President Donald Trump's involvement in planning for, participation in, and attendance at the Ellipse Rally;

    l. Communications with or concerning President Donald Trump, his family members, advisers, White House staff, or Trump Campaign staff regarding planning for, participation in, or attendance at the Ellipse Rally; and

Mr. Tim Unes
Page 4

      m. Communications with or concerning any member or member-elect of Congress, or their respective Congressional or campaign staffs, regarding planning for, participation in, or attendance at the Ellipse Rally.

2. For the time period November 1, 2020, to present, documents sufficient to identify all email accounts, social media accounts, and websites you used, whether directly or indirectly, to market, advertise, or promote, or otherwise communicate about, the Ellipse Rally.

3. For the time period November 1, 2020, to present, documents sufficient to identify all telephone numbers you used to communicate about the Ellipse Rally.

4. For the time period November 1, 2020, through January 31, 2021, documents sufficient to identify all financial accounts ("Financial Accounts") in which you were the direct or indirect beneficial owner, or over which you exercised control, and into which funds were transferred or deposited to compensate or reimburse you for your work in connection with the Ellipse Rally.

5. For each Financial Account identified in response to Request 4 above, documents sufficient to identify all account transactions for the time period November 1, 2020, to January 31, 2021, in connection with the Ellipse Rally.

6. For the time period January 6, 2021, to present, all documents and communications concerning the facts and circumstances of the attack on the U.S. Capitol in Washington, D.C. that occurred on January 6, 2021 (the "Capitol Attack").

7. To the extent not covered by the above requests, for the time period January 6, 2021, to present, all documents and communications provided to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the Ellipse Rally or the Capitol Attack.

8. For the time period January 6, 2021, to present, all correspondence or communications from or to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the Ellipse Rally or the Capitol Attack.

Mr. Tim Unes
Page 5

## **SCHEDULE B**

In accordance with the attached Definitions and Instructions, you, Tim Unes, in your capacity as a custodian of records for Event Strategies, Inc. (the "Entity"), are hereby required to produce, all documents and communications in the possession, custody, or control of the Entity—including any such documents or communications stored or located on Entity devices (e.g., personal computers, cellular phones, tablets, etc.), in Entity accounts, and/or on Entity applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to the following items. If no date range is specified below, the applicable dates are for the time period November 1, 2020, to present.

1. For the time period November 1, 2020, to present, all documents and communications concerning the rally Women for America First ("WFAF") held on the Ellipse in Washington, D.C. on January 6, 2021, at which President Donald Trump and others spoke (the "Ellipse Rally"), including but not limited to:

   a. Permit applications for the Ellipse Rally;

   b. Marketing, advertisement, or promotion of the Ellipse Rally;

   c. Sponsorships of the Ellipse Rally;

   d. Funding for the Ellipse Rally;

   e. Security, including but not limited to the identification of and planning for particular security risks, for the Ellipse Rally;

   f. Third-party vendors and service providers for logistics and equipment to be used at the Ellipse Rally;

   g. Agenda and selection of speakers for the Ellipse Rally;

   h. Coordination of the speakers' respective speeches for the Ellipse Rally, including but not limited to discussions of content and messaging;

   i. Attendees of the Ellipse Rally, including but not limited to designation and treatment of VIP attendees;

   j. Travel and accommodations for attendees of the Ellipse Rally, including but not limited to coordination of group travel and funding for the same;

   k. President Donald Trump's involvement in planning for, participation in, and attendance at the Ellipse Rally;

   l. Communications with or concerning President Donald Trump, his family members, advisers, White House staff, or Trump Campaign staff regarding planning for, participation in, or attendance at the Ellipse Rally; and

Mr. Tim Unes
Page 6

        m. Communications with or concerning any member or member-elect of Congress, or their respective Congressional or campaign staffs, regarding planning for, participation in, or attendance at the Ellipse Rally.

2. For the time period November 1, 2020, to present, documents sufficient to identify all social media accounts and websites Event Strategies, Inc. ("Event Strategies") used, whether directly or indirectly, to market, advertise, or promote, or otherwise communicate about, the Ellipse Rally.

3. For the time period November 1, 2020, to present, documents sufficient to identify all telephone numbers used by any employee, officer, or board member of Event Strategies to communicate about the Ellipse Rally.

4. For the time period November 1, 2020, through January 31, 2021, documents sufficient to identify all financial accounts ("Financial Accounts") for which Event Strategies was the direct or indirect beneficial owner, or over which Event Strategies exercised control, and into which funds were transferred or deposited to compensate or reimburse Event Strategies for its work in connection with the Ellipse Rally.

5. For each Financial Account identified in response to Request 4 above, documents sufficient to identify all account transactions for the time period November 1, 2020, to January 31, 2021, in connection with the Ellipse Rally.

6. For the time period January 6, 2021, to present, all documents and communications concerning the facts and circumstances of the attack on the U.S. Capitol in Washington, D.C. that occurred on January 6, 2021 (the "Capitol Attack").

7. To the extent not covered by the above requests, for the time period January 6, 2021, to present, all documents and communications provided to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the Ellipse Rally or the Capitol Attack.

8. For the time period January 6, 2021, to present, all correspondence or communications from or to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the Ellipse Rally or the Capitol Attack.

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1.   In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.   Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee").

3.   In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.   The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.   Electronic document productions should be prepared according to the following standards:

   a.   If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

   b.   All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

   BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6.  Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7.  Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8.  When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9.  The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10. The pendency of or potential for litigation shall not be a basis to withhold any information.

11. In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13. If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14. In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15. If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16. If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17.    This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18.    All documents shall be Bates-stamped sequentially and produced sequentially.

19.    Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1.    The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2. The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3. The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4. The term "including" shall be construed broadly to mean "including, but not limited to."

5. The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6. The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7. The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8. The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9. The term "individual" means all natural persons and all persons or entities acting on their behalf.

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

---

117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,
Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record.

Sincerely,

JAMES P. McGOVERN,
*Chairman, Committee on Rules.*

REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that depositions as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. Select Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

---

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,
Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the Congressional Record.

Sincerely,

JAMES P. McGOVERN,
*Chairman,
Committee on Rules.*

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.

# EXHIBIT G

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

Maggie Mulvaney

To _____

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

| |
|---|
| Place of production: 1540A Longworth House Office Building, Washington, DC 20515 |
| Date: October 13, 2021                    Time: 10:00 a.m. |

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

| |
|---|
| Place of testimony: 1540A Longworth House Office Building, Washington, DC 20515 |
| Date: October 26, 2021                    Time: 10:00 a.m. |

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

| |
|---|
| Place of testimony: _____ |
| Date: _____          Time _____ |

To any authorized staff member or the U.S. Marshals Service _____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 29th day of September , 2021

_____
*Chairman or Authorized Member*

Attest _____
*Clerk*

# PROOF OF SERVICE

Subpoena for Maggie Mulvaney

Address 1211 13th St. NW Apt. 105, Washington, DC 20005

before the Select Committee to Investigate the January 6th Attack on the United States Capitol

*U.S. House of Representatives*
*117th Congress*

Served by (print name)

Title

Manner of service

Date

Signature of Server

Address



**BENNIE G. THOMPSON, MISSISSIPPI**
**CHAIRMAN**

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
*LIZ CHENEY, WYOMING*
*ADAM KINZINGER, ILLINOIS*

U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225–7800

### One Hundred Seventeenth Congress
### Select Committee to Investigate the January 6th Attack on the United States Capitol

September 29, 2021

<u>VIA US and ELECTRONIC MAIL</u>

Maggie Mulvaney
1211 13th St. NW
Apt. 105
Washington, DC 20005
maggie.mulvaney@gmail.com

Dear Ms. Mulvaney:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena that compels you to produce the documents set forth in the accompanying Schedule by October 13, 2021, and to appear for a deposition on October 26, 2021.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures rules, or regulations. The inquiry includes examination of how various individuals and entities coordinated their activities leading up to the events of January 6, 2021.

The investigation has revealed credible evidence of your involvement in events within the scope of the Select Committee's inquiry. According to documents provided to the Select Committee, press reports, and statements by Women for America First ("WFAF"), you assisted in organizing the rally held on the Ellipse in Washington, D.C. on January 6, 2021, in support of then-President Trump and his allegations of election fraud. President Trump spoke at that rally shortly before the attack on the Capitol, urging the crowd to "fight much harder" and to "stop the steal."[1] On the same day that WFAF submitted the original permit application for the January 6th rally on behalf of WFAF, President Trump tweeted, "Big protest in D.C. on January 6th. Be there,

---

[1] Documents on file with the Select Committee; Joseph Tanfani, Michael Berens & Ned Parker, *How Trump's pied pipers rallied a faithful mob to the Capitol* (Reuters, Jan. 11, 2021), https://www.reuters.com/article/us-usa-trump-protest-organizers-insight/how-trumps-pied-pipers-rallied-a-faithful-mob-to-the-capitol-idUSKBN29G2UP; Women for America First homepage, *March for Trump*, https://wfaf.org/ (describing post-election rallies organized by Women for America First in support of President Trump); Women for America First, *Women for America First Statement on the Sham January 6th Commission* (July 21, 2021), https://wfaf.org/news/sham-commission/ (quoting Amy Kremer: "As head of the organization who sponsored the President's speech at the Ellipse, I would be happy to testify about the events leading up to and during that day, something I have never been asked to do by the Democrats in Congress").

Ms. Maggie Mulvaney
Page 2

will be wild!"[2] On subsequent permitting paperwork submitted by WFAF, you were described as the "VIP Lead."[3] According to press reports, those working with you and WFAF to organize the January 6th rally collectively communicated with President Trump, White House officials including Chief of Staff Mark Meadows, and others about the rally and other events planned to coincide with the certification of the 2020 Electoral College results.[4] Accordingly, the Select Committee seeks both documents and your deposition testimony regarding these and other matters that are within the scope of the Select Committee's inquiry.

A copy of the rules governing Select Committee depositions, and document production definitions and instructions are attached. Please contact staff for the Select Committee at 202-225-7800 to arrange for the production of documents.

Sincerely,

Bennie G. Thompson
Chairman

---

[2] Documents on file with the Select Committee; Dan Barry & Sheera Frenkel, *"Be There. Will be Wild!": Trump All but Circled the Date*, N.Y. TIMES (Jan. 6, 2021), https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html; Kremer, Kylie Jane [@KylieJaneKremer]. "The calvary is coming, Mr. President! JANUARY 6th | Washington DC http://TrumpMarch.com [U.S. flag emojis] #MarchForTrump #StopTheSteal." Twitter, December 19, 2020 (attaching advertisement for January 6 rally quoting Trump, Donald J. [@realDonaldTrump]. "Peter Navarro releases 36-page report alleging election fraud 'more than sufficient' to swing victory for Trump [link omitted]. A great report by Peter. Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!" Twitter, December 19, 2020), https://twitter.com/KylieJaneKremer/status/1340399063875895296.

[3] Documents on file with the Select Committee.

[4] Joshua Kaplan & Joaquin Sapien, *New Details Suggest Senior Trump Aides Knew Jan. 6 Rally Could Get Chaotic*, PROPUBLICA (June 25, 2021), https://www.propublica.org/article/new-details-suggest-senior-trump-aides-knew-jan-6-rally-could-get-chaotic.

Ms. Maggie Mulvaney
Page 3

## SCHEDULE

In accordance with the attached Definitions and Instructions, you, Maggie Mulvaney, are hereby required to produce, all documents and communications in your possession, custody, or control—including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal accounts, and/or on personal applications (e.g., email accounts, contact lists, calendar entries, etc.)—referring or relating to the following items. If no date range is specified below, the applicable dates are for the time period November 1, 2020, to present.

1. For the time period November 1, 2020, to present, all documents and communications concerning the rally Women for America First ("WFAF") held on the Ellipse in Washington, D.C. on January 6, 2021, at which President Donald Trump and others spoke (the "Ellipse Rally"), including but not limited to:

   a. Permit applications for the Ellipse Rally;

   b. Marketing, advertisement, or promotion of the Ellipse Rally;

   c. Sponsorships of the Ellipse Rally;

   d. Funding for the Ellipse Rally;

   e. Security, including but not limited to the identification of and planning for particular security risks, for the Ellipse Rally;

   f. Third-party vendors and service providers for logistics and equipment to be used at the Ellipse Rally;

   g. Agenda and selection of speakers for the Ellipse Rally;

   h. Coordination of the speakers' respective speeches for the Ellipse Rally, including but not limited to discussions of content and messaging;

   i. Attendees of the Ellipse Rally, including but not limited to designation and treatment of VIP attendees;

   j. Travel and accommodations for attendees of the Ellipse Rally, including but not limited to coordination of group travel and funding for the same;

   k. President Donald Trump's involvement in planning for, participation in, and attendance at the Ellipse Rally;

   l. Communications with or concerning President Donald Trump, his family members, advisers, White House staff, or Trump Campaign staff regarding planning for, participation in, or attendance at the Ellipse Rally; and

Ms. Maggie Mulvaney
Page 4

        m. Communications with or concerning any member or member-elect of Congress, or their respective Congressional or campaign staffs, regarding planning for, participation in, or attendance at the Ellipse Rally.

2. For the time period November 1, 2020, to present, documents sufficient to identify all email accounts, social media accounts, and websites you used, whether directly or indirectly, to market, advertise, or promote, or otherwise communicate about, the Ellipse Rally.

3. For the time period November 1, 2020, to present, documents sufficient to identify all telephone numbers you used to communicate about the Ellipse Rally.

4. For the time period November 1, 2020, through January 31, 2021, documents sufficient to identify all financial accounts ("Financial Accounts") in which you were the direct or indirect beneficial owner, or over which you exercised control, and into which funds were transferred or deposited to compensate or reimburse you for your work in connection with the Ellipse Rally.

5. For each Financial Account identified in response to Request 4 above, documents sufficient to identify all account transactions for the time period November 1, 2020, to January 31, 2021, in connection with the Ellipse Rally.

6. For the time period January 6, 2021, to present, all documents and communications concerning the facts and circumstances of the attack on the U.S. Capitol in Washington, D.C. that occurred on January 6, 2021 (the "Capitol Attack").

7. To the extent not covered by the above requests, for the time period January 6, 2021, to present, all documents and communications provided to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the Ellipse Rally or the Capitol Attack.

8. For the time period January 6, 2021, to present, all correspondence or communications from or to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the Ellipse Rally or the Capitol Attack.

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1.    In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.    Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee").

3.    In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.    The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.    Electronic document productions should be prepared according to the following standards:

   a.    If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

   b.    All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

   BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6. Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7. Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8. When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9. The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10. The pendency of or potential for litigation shall not be a basis to withhold any information.

11. In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13. If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14. In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15. If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16. If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17.   This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18.   All documents shall be Bates-stamped sequentially and produced sequentially.

19.   Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1.   The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.     The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3.     The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4.     The term "including" shall be construed broadly to mean "including, but not limited to."

5.     The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.     The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.     The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.     The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.     The term "individual" means all natural persons and all persons or entities acting on their behalf.

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

---

117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record.

Sincerely,
JAMES P. McGOVERN,
*Chairman, Committee on Rules.*

REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

---

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the Congressional Record.

Sincerely,
JAMES P. McGOVERN,
*Chairman,*
*Committee on Rules.*

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.

# EXHIBIT H

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

Megan Powers

*To* _____

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol

_____

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production: 1540A Longworth House Office Building, Washington, DC 20515
>
> Date: October 13, 2021                      Time: 10:00 a.m.

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: 1540A Longworth House Office Building, Washington, DC 20515
>
> Date: October 21 2021                      Time: 2:00 p.m.

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____          Time: _____

*To* any authorized staff member or the U.S. Marshals Service _____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 29th     day of September            , 20 21 .

_____
*Chairman or Authorized Member*

Attest _____

*Clerk*

## PROOF OF SERVICE

Subpoena for Megan Powers

Address 1720 SW 5th St., Fort Lauderdale, FL 33312-77510

before the Select Committee to Investigate the January 6th Attack on the United States Capitol

*U.S. House of Representatives*
*117th Congress*

Served by (print name)

Title

Manner of service

Date

Signature of Server

Address



**BENNIE G. THOMPSON, MISSISSIPPI**
**CHAIRMAN**

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS

U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225–7800

### One Hundred Seventeenth Congress
### Select Committee to Investigate the January 6th Attack on the United States Capitol

September 29, 2021

<u>VIA US and ELECTRONIC MAIL</u>

Megan Powers
MPowers Consulting LLC
1720 SW 5th St.
Fort Lauderdale, FL 33312-77510
megan@mpowersconsulting.com

Dear Ms. Powers:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena that compels you to produce the documents set forth in the accompanying Schedules A and B by October 13, 2021, and to appear for a deposition on October 21, 2021.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures rules, or regulations. The inquiry includes examination of how various individuals and entities coordinated their activities leading up to the events of January 6, 2021.

The investigation has revealed credible evidence of your involvement in events within the scope of the Select Committee's inquiry. According to documents provided to the Select Committee, press reports, and statements by Women for America First ("WFAF"), you assisted in organizing the rally held on the Ellipse in Washington, D.C. on January 6, 2021, in support of then-President Trump and his allegations of election fraud. President Trump spoke at that rally shortly before the attack on the Capitol, urging the crowd to "fight much harder" and to "stop the steal."[1] On the same day that WFAF submitted the original permit application for the January 6th rally on behalf of WFAF, President Trump tweeted, "Big protest in D.C. on January 6th. Be there,

---

[1] Documents on file with the Select Committee; Joseph Tanfani, Michael Berens & Ned Parker, *How Trump's pied pipers rallied a faithful mob to the Capitol* (Reuters, Jan. 11, 2021), https://www.reuters.com/article/us-usa-trump-protest-organizers-insight/how-trumps-pied-pipers-rallied-a-faithful-mob-to-the-capitol-idUSKBN29G2UP; Women for America First homepage, *March for Trump*, https://wfaf.org/ (describing post-election rallies organized by Women for America First in support of President Trump); Women for America First, *Women for America First Statement on the Sham January 6th Commission* (July 21, 2021), https://wfaf.org/news/sham-commission/ (quoting Amy Kremer: "As head of the organization who sponsored the President's speech at the Ellipse, I would be happy to testify about the events leading up to and during that day, something I have never been asked to do by the Democrats in Congress").

Ms. Megan Powers
Page 2

will be wild!"[2] On subsequent permitting paperwork submitted by WFAF, you were described as the "Operations Manager for Scheduling and Guidance."[3] The contact information contained in the permit paperwork included an email address affiliated with your company, MPowers Consulting LLC. According to press reports, those working with you and WFAF to organize the January 6th rally collectively communicated with President Trump, White House officials including Chief of Staff Mark Meadows, and others about the rally and other events planned to coincide with the certification of the 2020 Electoral College results.[4] Accordingly, the Select Committee seeks both documents and your deposition testimony regarding these and other matters that are within the scope of the Select Committee's inquiry.

A copy of the rules governing Select Committee depositions, and document production definitions and instructions are attached. Please contact staff for the Select Committee at 202-225-7800 to arrange for the production of documents.

Sincerely,

Bennie G. Thompson
Chairman

---

[2] Documents on file with the Select Committee; Dan Barry & Sheera Frenkel, *"Be There. Will be Wild!": Trump All but Circled the Date*, N.Y. TIMES (Jan. 6, 2021), https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html; Kremer, Kylie Jane [@KylieJaneKremer]. "The calvary is coming, Mr. President! JANUARY 6th | Washington DC http://TrumpMarch.com [U.S. flag emojis] #MarchForTrump #StopTheSteal." Twitter, December 19, 2020 (attaching advertisement for January 6 rally quoting Trump, Donald J. [@realDonaldTrump]. "Peter Navarro releases 36-page report alleging election fraud 'more than sufficient' to swing victory for Trump [link omitted]. A great report by Peter. Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!" Twitter, December 19, 2020), https://twitter.com/KylieJaneKremer/status/1340399063875895296.

[3] Documents on file with the Select Committee.

[4] Joshua Kaplan & Joaquin Sapien, *New Details Suggest Senior Trump Aides Knew Jan. 6 Rally Could Get Chaotic*, PROPUBLICA (June 25, 2021), https://www.propublica.org/article/new-details-suggest-senior-trump-aides-knew-jan-6-rally-could-get-chaotic.

Ms. Megan Powers
Page 3

## SCHEDULE A

In accordance with the attached Definitions and Instructions, you, Megan Powers, are hereby required to produce, all documents and communications in your possession, custody, or control—including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal accounts, and/or on personal applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to the following items. If no date range is specified below, the applicable dates are for the time period November 1, 2020, to present.

1. For the time period November 1, 2020, to present, all documents and communications concerning the rally Women for America First ("WFAF") held on the Ellipse in Washington, D.C. on January 6, 2021, at which President Donald Trump and others spoke (the "Ellipse Rally"), including but not limited to:

    a. Permit applications for the Ellipse Rally;

    b. Marketing, advertisement, or promotion of the Ellipse Rally;

    c. Sponsorships of the Ellipse Rally;

    d. Funding for the Ellipse Rally;

    e. Security, including but not limited to the identification of and planning for particular security risks, for the Ellipse Rally;

    f. Third-party vendors and service providers for logistics and equipment to be used at the Ellipse Rally;

    g. Agenda and selection of speakers for the Ellipse Rally;

    h. Coordination of the speakers' respective speeches for the Ellipse Rally, including but not limited to discussions of content and messaging;

    i. Attendees of the Ellipse Rally, including but not limited to designation and treatment of VIP attendees;

    j. Travel and accommodations for attendees of the Ellipse Rally, including but not limited to coordination of group travel and funding for the same;

    k. President Donald Trump's involvement in planning for, participation in, and attendance at the Ellipse Rally;

    l. Communications with or concerning President Donald Trump, his family members, advisers, White House staff, or Trump Campaign staff regarding planning for, participation in, or attendance at the Ellipse Rally; and

Ms. Megan Powers
Page 4

      m. Communications with or concerning any member or member-elect of Congress, or their respective Congressional or campaign staffs, regarding planning for, participation in, or attendance at the Ellipse Rally.

2. For the time period November 1, 2020, to present, documents sufficient to identify all email accounts, social media accounts, and websites you used, whether directly or indirectly, to market, advertise, or promote, or otherwise communicate about, the Ellipse Rally.

3. For the time period November 1, 2020, to present, documents sufficient to identify all telephone numbers you used to communicate about the Ellipse Rally.

4. For the time period November 1, 2020, through January 31, 2021, documents sufficient to identify all financial accounts ("Financial Accounts") in which you were the direct or indirect beneficial owner, or over which you exercised control, and into which funds were transferred or deposited to compensate or reimburse you for your work in connection with the Ellipse Rally.

5. For each Financial Account identified in response to Request 4 above, documents sufficient to identify all account transactions for the time period November 1, 2020, to January 31, 2021, in connection with the Ellipse Rally.

6. For the time period January 6, 2021, to present, all documents and communications concerning the facts and circumstances of the attack on the U.S. Capitol in Washington, D.C. that occurred on January 6, 2021 (the "Capitol Attack").

7. To the extent not covered by the above requests, for the time period January 6, 2021, to present, all documents and communications provided to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the Ellipse Rally or the Capitol Attack.

8. For the time period January 6, 2021, to present, all correspondence or communications from or to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the Ellipse Rally or the Capitol Attack.

Ms. Megan Powers
Page 5

## **SCHEDULE B**

In accordance with the attached Definitions and Instructions, you, Megan Powers are hereby required to produce all documents and communications in the possession, custody, or control of MPowers Consulting LLC (the "Entity") to the extent you are a custodian of records for the Entity—including any such documents or communications stored or located on Entity devices (e.g., personal computers, cellular phones, tablets, etc.), in Entity accounts, and/or on Entity applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to the following items.  If no date range is specified below, the applicable dates are for the time period November 1, 2020, to present.

1.  For the time period November 1, 2020, to present, all documents and communications concerning the rally Women for America First ("WFAF") held on the Ellipse in Washington, D.C. on January 6, 2021, at which President Donald Trump and others spoke (the "Ellipse Rally"), including but not limited to:

    a.  Permit applications for the Ellipse Rally;

    b.  Marketing, advertisement, or promotion of the Ellipse Rally;

    c.  Sponsorships of the Ellipse Rally;

    d.  Funding for the Ellipse Rally;

    e.  Security, including but not limited to the identification of and planning for particular security risks, for the Ellipse Rally;

    f.  Third-party vendors and service providers for logistics and equipment to be used at the Ellipse Rally;

    g.  Agenda and selection of speakers for the Ellipse Rally;

    h.  Coordination of the speakers' respective speeches for the Ellipse Rally, including but not limited to discussions of content and messaging;

    i.  Attendees of the Ellipse Rally, including but not limited to designation and treatment of VIP attendees;

    j.  Travel and accommodations for attendees of the Ellipse Rally, including but not limited to coordination of group travel and funding for the same;

    k.  President Donald Trump's involvement in planning for, participation in, and attendance at the Ellipse Rally;

    l.  Communications with or concerning President Donald Trump, his family members, advisers, White House staff, or Trump Campaign staff regarding planning for, participation in, or attendance at the Ellipse Rally; and

Ms. Megan Powers
Page 6

    m.  Communications with or concerning any member or member-elect of Congress, or their respective Congressional or campaign staffs, regarding planning for, participation in, or attendance at the Ellipse Rally.

2. For the time period November 1, 2020, to present, documents sufficient to identify all social media accounts and websites MPowers Consulting LLC ("MPowers Consulting") used, whether directly or indirectly, to market, advertise, or promote, or otherwise communicate about, the Ellipse Rally.

3. For the time period November 1, 2020, to present, documents sufficient to identify all telephone numbers used by any employee, officer, or board member of MPowers Consulting to communicate about the Ellipse Rally.

4. For the time period November 1, 2020, through January 31, 2021, documents sufficient to identify all financial accounts ("Financial Accounts") for which MPowers Consulting was the direct or indirect beneficial owner, or over which MPowers Consulting exercised control, and into which funds were transferred or deposited to compensate or reimburse MPowers Consulting for its work in connection with the Ellipse Rally.

5. For each Financial Account identified in response to Request 4 above, documents sufficient to identify all account transactions for the time period November 1, 2020, to January 31, 2021, in connection with the Ellipse Rally.

6. For the time period January 6, 2021, to present, all documents and communications concerning the facts and circumstances of the attack on the U.S. Capitol in Washington, D.C. that occurred on January 6, 2021 (the "Capitol Attack").

7. To the extent not covered by the above requests, for the time period January 6, 2021, to present, all documents and communications provided to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the Ellipse Rally or the Capitol Attack.

8. For the time period January 6, 2021, to present, all correspondence or communications from or to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the Ellipse Rally or the Capitol Attack.

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1.  In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.  Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee").

3.  In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.  The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.  Electronic document productions should be prepared according to the following standards:

    a.  If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

    b.  All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

    BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6. Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7. Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8. When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9. The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10. The pendency of or potential for litigation shall not be a basis to withhold any information.

11. In accordance with 5 U.S.C. § 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13. If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14. In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15. If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16. If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17. This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18. All documents shall be Bates-stamped sequentially and produced sequentially.

19. Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

### Definitions

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2. The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3. The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4. The term "including" shall be construed broadly to mean "including, but not limited to."

5. The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6. The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7. The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8. The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9. The term "individual" means all natural persons and all persons or entities acting on their behalf.

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

## 117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,
Washington, DC.*
MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record.
Sincerely,
JAMES P. MCGOVERN,
*Chairman, Committee on Rules.*
REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place or examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses shall be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

## REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,
Washington, DC.*
MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the CONGRESSIONAL RECORD.
Sincerely,
JAMES P. MCGOVERN,
*Chairman,
Committee on Rules.*
REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.